## EASTON *v.* IOWA.

ERROR TO THE SUPREME COURT OF THE STATE OF IOWA.

No. 92. Argued January 14, 15, 1903.—Decided February 2, 1903.

Congress having power to create a system of national banks, is the judge as to the extent of the powers which should be conferred upon such banks, and has the sole power to regulate and control the exercise of their operations. Congress having dealt directly with the insolvency of national banks by giving control to the Secretary of the Treasury and the Comptroller of the Currency, who are authorized to suspend the operations of the banks and appoint receivers thereof when they become insolvent, or when they fail to make good any impairment of capital, and full and adequate provision having been made for the protection of creditors of national banks by requiring frequent reports to be made of their condition, and by the power of visitation of Federal officers, it is not competent for state legislatures to interfere, whether with hostile or friendly intentions, with national banks or their officers in the exercise of the powers bestowed upon them by the general government.

While a State has the legitimate power to define and punish crimes by general laws applicable to all persons within its jurisdiction, and it may declare, by special laws, certain acts to be criminal offences when committed by officers and agents of its own banks and institutions, it is without lawful power to make such special laws applicable to banks organized and operated under the laws of the United States.

IN 1899, in the District Court of Wenneshiek County, State of Iowa, James H. Easton, who had been previously indicted,

was tried, found guilty, and sentenced to imprisonment in the penitentiary of Iowa at hard labor for a term of five years, under the provisions of a statute of that State, for the offence of having received, as president of the First National Bank of Decorah, Iowa, a deposit of one hundred dollars in money in said bank, at a time when the bank was insolvent and when such insolvency was known to the defendant.

At the trial it was contended, on behalf of the defendant, that the statute of Iowa, upon which the indictment was found, did not, and was not intended to, apply to national banks, organized and doing business under the national bank acts of the United States, or to the officers and agents of such banks; and that, if the state statute should be construed and held to apply to national banks and their officers, the statute was void in so far as made applicable to national banks and their officers. Both these contentions were overruled by the trial court, and thereupon an appeal was taken to the Supreme Court of the State of Iowa, and by that court, on April 12, 1901, the judgment of the District Court was affirmed. 113 Iowa, 516. The cause was then brought to this court by a writ of error allowed by the Chief Justice of the Supreme Court of Iowa.

*Mr. Charles F. Brown* and *Mr. H. T. Reed,* with whom *Mr. John J. Crawford* and *Mr. C. W. Reed* were on the brief, for the plaintiff in error.

National banks are agencies of the National Government created by Congress to enable it to exercise and conduct its fiscal powers and operations. They are instruments of the Federal Government created for public purposes and as such necessarily subject to the paramount authority of the United States. *McCulloch* v. *Maryland,* 4 Wheaton, 425; *Osborn* v. *U. S. Bank,* 9 Wheaton, 738; *Legal Tender Cases,* 110 U. S. 421.

The necessity for the incorporation and regulation of such institution theretofore being a matter solely within the jurisdiction of Congress, the whole subject is a matter out of the plane of state control and jurisdiction. The States cannot legislate upon such a matter, and statutes enacted by state legislatures cannot, by judicial interpretation and construction, be

made applicable to such institutions.  *Davis* v. *Elmira Savings Bank*, 161 U. S. 275, 283.

The National Banking Act does not prohibit or forbid the receipt of deposits by a bank when insolvent at any time before it is taken out of the control of its officers by the Comptroller of the Currency, acting under the provisions of the National Banking Act.  *State* v. *Fields*, 98 Iowa, 74; *McDonald* v. *Chemical Nat. Bank*, 174 U. S. 610 ; Rev. Stat. sec. 5205.

A State has no power to legislate in reference to national banks, or to alter or supplement any of the provisions of the National Banking Act.  *Farmers' National Bank* v. *Dearing*, 91 U. S. 29 ; *Prigg* v. *Pennsylvania*, 16 Peters, 539; *Hall* v. *DeCuir*, 95 U. S. 499 ; *Leisy* v. *Hardin*, 135 U. S. 100.

The statute of Iowa violates the fundamental propositions in that it attempts to supplement the National Banking Act and to regulate and control and limit the business of national banks within the State of Iowa, and directly invades the jurisdiction conferred by Congress upon the Secretary of the Treasury and the Comptroller of the Currency.  *McClellan* v. *Chipman*, 164 U. S. 356 ; *Fuzz* v. *Spaunhorst*, 67 Missouri, 256.

This case falls within the principles laid down in *McCulloch* v. *Maryland*, and in *Osborn* v. *United States Bank*, that the States have no power to tax a national bank.  It is also within the principle applied in *Prigg* v. *Pennsylvania*, *Ohio* v. *Thomas*, *In re Waite* and *Cunningham* v. *Nagle*.  The means and agencies provided and selected by the Federal Government as necessary and convenient to the exercise of its functions cannot be subject to the taxing power of the States, and so also the Federal Government is without power to tax the corresponding means and agencies of the States.  Cooley on Taxation, chap. 1, p. 7, chap. 3, pp. 56–58, cases already cited ; *Weston* v. *Charleston*, 2 Peters, 499 ; *Bank of Commerce* v. *New York*, 2 Black, 620 ; *Palfrey* v. *Boston*, 101 Massachusetts, 329 ; *Dobbins* v. *Commissioners of Erie Co.*, 16 Peters, 435 ; *Ward* v. *Maryland*, 12 Wall. 418–427 ; *Collector* v. *Day*, 11 Wall. 117 ; *Freedman* v. *Sigel*, 10 Blatch. 327 ; *Moore* v. *Quirk*, 105 Massachusetts, 49 ; *Carpenter* v. *Snelling*, 97 Massachusetts, 455 ; *People* v. *Gates*, 43 N. Y. 40 ; *Green* v. *Holway*, 101 Massachusetts, 293 ; *State*

v. *Gaston*, 32 Indiana, 1 ; Cooley on Constitutional Limitation, pp. 481, 484, and cases cited in notes.

The argument of the learned attorney general does not sustain the proposition for which he contends.

His argument, briefly stated, is as follows: The certificate of the Comptroller of the Currency is issued to a bank because of its solvency and ability to carry on a legitimate banking business. No certificate would be issued to an insolvent bank. Therefore, whenever a bank becomes insolvent, its authority to continue business must necessarily cease. The fact that a bank holds the Comptroller's certificate cannot and does not authorize it to continue business or to receive deposits a single instant after it becomes insolvent. It is contended that these propositions are supported by the well recognized and sound principle of law that the receipt of a deposit of money by an insolvent bank is a fraud, and it is contended that no act of Congress or certificate of Comptroller of the Currency can authorize a fraud.

This argument is sufficiently answered by reference to the sections of the National Banking Act, which authorize a bank to carry on its business after it is insolvent, and do not prohibit the receipt of deposits when insolvent, but refer the subject of the control of such institutions, under all circumstances, to the Comptroller of the Currency and Secretary of the Treasury.

Admitting all that the attorney general says, we submit it has no relevancy to the question of the power of the State of Iowa to enact the statute in question. Everything that is said on pages fifteen and sixteen of the brief of the learned attorney general might well be addressed to Congress, but it has no force in determining the scope of the constitutional power of a State upon the subject under consideration. The argument of the learned attorney general all leads up to the conclusion stated upon page sixteen of his brief as follows:

"The effect of the statute is to require of the officers of all banks within the State, a higher degree of diligence in the discharge of their duties. It gives to the general public greater confidence in the stability and solvency of national banks, and

in the honesty and integrity of their managing officers. It enables them, better to accomplish the purposes and designs of the General Government, and is an aid, rather than an impediment, to their utility and efficiency as agents and instrumentalities of the United States."

Assuming this to be true, is not Congress the sole judge of the policy to be adopted and enforced in cases of the insolvency of national banks?

Can a state legislature say: The scheme adopted and put in force by Congress in respect to national banks does not command public confidence; or that does not give to such institutions sufficient stability. The States can exercise no concurrent or independent power in reference to the management of such institutions, as from their nature institution or where the purpose to be served is one which must be necessarily exercised by the National Government exclusively. *Gilman* v. *Philadelphia*, 3 Wallace, 730.

*Mr. Charles W. Mullan*, attorney general of the State of Iowa, for defendant in error.

I. The legislature of Iowa intended that the statute should apply to national banks transacting business in Iowa. *State* v. *Fields*, 98 Iowa, 748; *State* v. *Easton*, 85 N. W. Rep. 795; distinguishing *State* v. *Menche*, 56 Kansas, 77; *Commonwealth* v. *Ketner*, 92 Pa. St. 372; *Allen* v. *Carter*, 119 Pa. St. 192. It is a familiar rule of law that the construction of a statute by the highest court of the enacting State will be followed by the Federal courts. *Bucher* v. *Cheshire R. R. Co.*, 125 U. S. 582; *Bacon* v. *Northwestern Life Ins. Co.*, 131 U. S. 264; *Ankeny* v. *Clark*, 148 U. S. 354; *Adams Express Co.* v. *Ohio*, 165 U. S. 219.

II. The statute is not invalid as to national banks conducting business in Iowa. It is based on the well recognized and sound principle of law which is that the receipt of a deposit of money by an insolvent bank is a fraud. No act of Congress or certificate of the Comptroller of the Currency, can authorize or legalize the commission of a fraud. *Meadowcraft* v. *The People*, 163 Illinois, 65; *St. Louis &c. Ry. Co.* v. *Johnson*, 133 U. S. 566;

*Craigie* v. *Hadley*, 99 N. Y. 131 ; *The N. Y. Breweries Co.* v. *Higgins*, 79 Hun, 250 ; *Wasson* v. *Hawkins*, 59 Fed. Rep. 233 ; *Trust & Savings Bank* v. *Mfg. Co.*, 150 Illinois, 340 ; *First National Bank* v. *Strauss*, 66 Mississippi, 479 ; 14 Am. St. Rep. 581 ; *Plumley* v. *Massachusetts*, 155 U. S. 461 ; *Bank* v. *Commonwealth*, 9 Wall. 361, cited as distinguishing and limiting, *McCulloch* v. *Maryland*, 4 Wheat. 316 and *Farmers' &c. Nat. Bank* v. *Dearing*, 91 U. S. 29 ; *McClellan* v. *Chipman*, 164 U. S. 356. The statute does not and, therefore, cannot be held invalid on the ground that it in anywise, does interfere, impair, impede or destroy the efficiency of national banks in attaining the objects for which they were created, or impair their efficiency and utility as instrumentalities of the government. *Davis* v. *Elmira Savings Bank*, 161 U. S. 275, 283 ; *Waite* v. *Dowley*, 94 U. S. 533 ; citing and distinguishing *Cook County Nat. Bank* v. *United States*, 107 U. S. 445 ; *Ohio* v. *Thomas*, 173 U. S. 276 ; *In re Neagle*, 135 U. S. 1 ; *In re Waite*, 81 Fed. Rep. 363. The States are original sovereign powers and as such retain every sovereign right not delegated to the General Government. They are the foundation upon which the Federal government rests. *Lane County* v. *Oregon*, 7 Wall. 76 ; *Railroad Co.* v. *Peniston*, 18 Wall. 31 ; *Texas* v. *White*, 7 Wall. 725.

III. The Federal government has not, as yet, intervened and occupied this field of legislation, to the exclusion of the power of the State to legislate upon the subject. See *Gilman* v. *Philadelphia*, 3 Wall. 730, as to when States may exercise concurrent or independent power. *Prigg* v. *Pennsylvania*, 16 Peters, 539, and *People* v. *Fonda*, 62 Michigan, 401, cited and distinguished, the latter as being in direct conflict with decisions of this court. *Cross* v. *North Carolina*, 132 U. S. 139 ; *Teal* v. *Felton*, 12 How. 284 ; *Moore* v. *People*, 14 How. 13 ; *Commonwealth* v. *Tenny*, 97 Massachusetts, 50 ; *Hoke* v. *The People*, 122 Illinois, 511 ; *Commonwealth* v. *Luberg*, 94 Pa. St. 85, cited as overruling *State* v. *Ketner*, 92 Pa. St. 372.

IV. The enactment of the statute was a proper exercise of the police power of the State. Cooley on Const. Lim. 6th ed., 704, 706 ; *United States* v. *De Witt*, 9 Wall. 41 ; *License Cases*,

5 How. 504; *Passenger Cases*, 7 How. 283; *Slaughter House Cases*, 16 Wall. 36; *Patterson* v. *Kentucky*, 97 U. S. 503. The police power of a State cannot be alienated even by an express grant; it is a power and responsibility which legislatures cannot divest themselves of if they would. *Thorp* v. *R. & B. R. R. Co.*, 27 Vermont, 149; *Beer Co.* v. *Massachusetts*, 97 U. S. 33; *Stone* v. *Mississippi*, 101 U. S. 814. The Fourteenth Amendment does not take from the States the police powers reserved at the time of the adoption of the Constitution. *Slaughter House Cases*, 16 Wall. 36; *Barbier* v. *Connolly*, 113 U. S. 27; *Mugler* v. *Kansas*, 123 U. S. 623; *United States* v. *Cruikshank*, 92 U. S. 555; *State* v. *Noyes*, 47 Maine, 189; *Lake View* v. *Rose Hill Cemetery*, 70 Illinois, 191. Fraud is trespass upon the rights of others and may therefore always be punished. Tiedeman's Limitations of Police Powers, 291. An insolvent bank has no right to continue business or to receive deposits; it is the duty of its officers to at once close its doors, decline deposits and discontinue business. *Anonymous Case*, 67 N. Y. 598; *Craigie* v. *Hadley*, 99 N. Y. 133; 52 Am. Rep. 9; *St. Louis &c. Ry. Co.* v. *Johnson*, 133 U. S. 566; *Am. Trust &c. Bank* v. *Gueder &c. Mfg. Co.*, 150 Illinois, 336; *Meridian First Nat. Bank* v. *Straw*, 56 Mississippi, 479; 14 Am. St. Rep. 579. The Supreme Court of Mississippi, in a case precisely like the one at bar, sustained the validity of a similar statute. *State* v. *Bardwell*, 72 Mississippi, 535.

V. The statute does not unjustly discriminate against banks and their officers and agents or deny them equal protection under the laws of the State, and is not repugnant to, or void under, the Fourteenth Amendment. The law bears equally upon all persons falling within its classification. Cooley's Constitutional Limitations, 6th ed. 479–481. Legislation limited as to business or territory does not infringe upon the constitutional right of equal protection and right of contract where all persons subject to it are treated alike under like circumstances and conditions. *Munn* v. *Illinois*, 94 U. S. 113; *Walston* v. *Neven*, 128 U. S. 578; *Barbier* v. *Connolly*, 113 U. S. 32; *Hayes* v. *Missouri*, 120 U. S. 68; *Mo. Pac. Ry. Co.* v. *Mackey*, 127 U. S. 205; *Minneapolis &c. Ry. Co.* v. *Herrick*, 127

U. S. 210 ; *State* v. *Schemmer*, 10 L. R. A. 135 ; *Vt. Loan & Trust Co.* v. *Whitehead*, 49 N. W. R. 318 ; *State* v. *Moore*, 104 N. C. 714 ; *Ex parte Swan*, 96 Missouri, 44.

The statute does not go so far as to attempt to regulate the business of banks, but simply makes fraudulent acts of persons within the State an offence punishable under the law.

MR. JUSTICE SHIRAS, after making the foregoing statement, delivered the opinion of the court.

Those portions of the Iowa statute whose validity is the question in this case consist of sections 1884 and 1885 of the code of that State, and are in the following terms:

" SEC. 1884. No bank, banking house, exchange broker, deposit office, firm, company, corporation, or person engaged in the banking, brokerage, exchange or deposit business, shall, when insolvent, accept or receive on deposit, with or without interest, any money, bank bills or notes, United States Treasury notes or currency, or other notes, bills, checks or drafts, or renew any certificate of deposit.

" SEC. 1885. If any such bank, banking house, exchange broker, deposit office, firm, company, corporation or person shall receive or accept on deposit any such deposits, as aforesaid, when insolvent, any owner, officer, director, cashier, manager, member or person knowing of such insolvency, who shall knowingly receive or accept, be accessory, or permit, or connive at receiving or accepting on deposit therein, or thereby, any such deposits, or renew any certificate of deposit, as aforesaid, shall be guilty of a felony, and, upon conviction, shall be punished by a fine not exceeding ten thousand dollars, or by imprisonment in the penitentiary for a term of not more than ten years, or by imprisonment in the county jail not more than one year, or by both fine and imprisonment."

At the trial evidence was adduced tending to show, and the jury found, that the defendant, being engaged in the banking business, as an officer, to wit, president of the First National Bank of Decorah, on the 21st day of August, A. D. 1896, did, as president of said bank, receive and accept on deposit in said

bank the sum of one hundred dollars in lawful paper money and of the value of one hundred dollars, from one John French, the bank being then and there insolvent, and the defendant then and there well knowing that the said bank was insolvent.

It will be observed that national banks or banking associations are not specifically named in the statute; and it was hence argued on behalf of the defendant, that such institutions are not within the enactment. As, however, the state courts, following a previous decision of the Supreme Court of Iowa, in the case of *State* v. *Fields*, 98 Iowa, 748, held that the statute was applicable to all banks, whether organized under the laws of the State or the acts of Congress, we must accept that construction as correct, and confine our consideration to the question whether, as so construed, the act is within the jurisdiction of the State.

It is obvious that the two sections of the statute, above quoted, must be read together as one enactment. If section 1884, regarded as applicable to national banks, is a valid exercise of power by the State, then the penalties declared in section 1885 can be properly enforced; but if section 1884 must be held invalid as an attempt to control and regulate the business operations of national banks, then the penal provisions of section 1885 cannot be enforced against their officers. In other words, the validity of the mandatory and of the penal parts of the statute must stand or fall together.

What, then, is the character of a state law which forbids national banks, when insolvent, from accepting or receiving on deposit, with or without interest, any money, bank bills or notes, United States Treasury notes or currency, or other notes, bills, checks or drafts, or renewing any certificate of deposit?

The answer given by the Supreme Court of Iowa to this question is as follows:

"The acts of Congress provide no penalty for the fraudulent receiving of deposits, and the statute under consideration operates upon the person who commits the crime. And it is not a material question to determine whether it will be necessary to investigate the financial condition of the bank, to prove that the bank was insolvent when the deposit was received. This

statute is in the nature of a police regulation, having for its object the protection of the public from the fraudulent acts of bank officers. The mere fact that in violating the law of the State the defendant performed an act pertaining to his duty as an officer of the bank, does not in any manner interfere with the proper discharge of any duty he owes to any power, state or Federal. Surely, it was not intended by any act of Congress that officers of a national bank should be clothed with the power to cheat and defraud its patrons. National banks are organized and their business prosecuted for private gain, and we can conceive of no reason why the officers of such banks should be exempt from the penalties prescribed for fraudulent banking."

We think that this view of the subject is not based on a correct conception of the Federal legislation creating and regulating national banks. That legislation has in view the erection of a system extending throughout the country, and independent, so far as powers conferred are concerned, of state legislation which, if permitted to be applicable, might impose limitations and restrictions as various and as numerous as the States. Having due regard to the national character and purposes of that system, we cannot concur in the suggestions that national banks, in respect to the powers conferred upon them, are to be viewed as solely organized and operated for private gain. The principles enunciated in *McCulloch* v. *Maryland*, 4 Wheat. 316, 425, and in *Osborn* v. *United States Bank*, 9 Wheat. 738, though expressed in respect to banks incorporated directly by acts of Congress, are yet applicable to the later and present system of national banks.

In the latter case it was said by Chief Justice Marshall:

"The bank is not considered as a private corporation, whose principal object is individual trade and individual profit; but as a public corporation, created for public and national purposes. That the mere business of banking is, in its own nature, a private business, and may be carried on by individuals or companies having no political connection with the government, is admitted; but the bank is not such an individual or company. It was not created for its own sake or for private purposes. It has never been supposed that Congress could create such a cor-

poration.  The whole opinion of the court, in *McCulloch* v.
*Maryland*, is founded on, and sustained by, the idea that the
bank is an instrument which is ' necessary and proper for carry-
ing into effect the powers vested in the government of the
United States.' "

A similar view of the nature of banks organized under the
national bank laws has been frequently expressed by this court.
Thus, in *Farmers' National Bank* v. *Dearing,* 91 U. S. 29, it
was said:

"National banks organized under the act are instruments de-
signed to be used to aid the government in the administration
of an important branch of the public service.  They are means
appropriate to that end."

Such being the nature of these national institutions, it must
be obvious that their operations cannot be limited or controlled
by state legislation, and the Supreme Court of Iowa was in
error when it held that national banks are organized and their
business prosecuted for private gain, and that there is no reason
why the officers of such banks should be exempt from the pen-
alties prescribed for fraudulent banking.  Nor is it altogether
true, as asserted by that court, that there is no act of Congress
prohibiting the receipt of deposits by national banks or their
officers, when a bank is insolvent.  It is true that there is no
express prohibition contained in the Federal statutes, but there
are apt provisions, sanctioned by severe penalties, which are
intended to protect the depositors and other creditors of na-
tional banks from fraudulent banking.  It is not necessary to
quote at length those provisions, but it will be sufficient to say
that a bank organized under the national bank act is author-
ized to make contracts; to prescribe, by its board of directors,
by-laws regulating the manner in which its general business
shall be conducted, and the privileges granted by law exercised
and enjoyed; to exercise by its board of directors, or duly au-
thorized officers, all such incidental powers as shall be necessary
to carry on the business of banking, by discounting and negotiat-
ing promissory notes and drafts, bills of exchange; by receiv-
ing deposits; by buying and selling exchange; by loaning
money on personal security.  Such banks are required to deposit

with the Treasurer of the United States, as security for their circulating notes, United States bonds in an amount not less than one fourth of their capital; to report to the Treasurer of the United States twice each year the average amount of their deposits, and to pay to said Treasurer each half year a tax upon such deposits; and to make to the Comptroller of the Currency not less than five reports during each year, (and special reports as often as he may require,) according to such form as he may require, verified by the oath or affirmation of the president or cashier, which reports shall exhibit in detail the resources and liabilities of the association. The Comptroller is directed to appoint suitable persons to make examination of the affairs of every banking association, who shall have power to make a thorough examination into all the affairs of the association, and in doing so to examine any of the officers or agents thereof, and to make a full and detailed report of the condition to the Comptroller. Whenever the Comptroller becomes satisfied of the insolvency of such bank he may, after due examination of its affairs, appoint a receiver, who shall take possession of the assets of the association, wind up its affairs, and make ratable distribution of its assets. And severe penalties are imposed upon any officer or agent of such association who violates any of the provisions of the national bank act.

It thus appears that Congress has provided a symmetrical and complete scheme for the banks to be organized under the provisions of the statute.

It is argued by the learned Attorney General on behalf of the State of Iowa that "the effect of the statute of Iowa is to require of the officers of all banks within the State a higher degree of diligence in the discharge of their duties. It gives to the general public greater confidence in the stability and solvency of national banks, and in the honesty and integrity of their managing officers. It enables them better to accomplish the purposes and designs of the general government, and is an aid, rather than impediment, to their utility and efficiency as agents and instrumentalities of the United States."

But we are unable to perceive that Congress intended to leave the field open for the States to attempt to promote the wel-

fare and stability of national banks by direct legislation. If they had such power it would have to be exercised and limited by their own discretion, and confusion would necessarily result from control possessed and exercised by two independent authorities.

Nor can we concede that by such legislation of a State, as was attempted in this instance, the affairs of a national bank, or the security of its creditors, would be advantageously affected. The provision of the state statute is express that it is the duty of the officers of the bank, when they know it is insolvent, to at once suspend its active operations; for it is obvious, that to refuse to accept deposits would be equivalent to a cessation of business. Whether a bank is or is not actually insolvent may be, often, a question hard to answer. There may be good reason to believe that, though temporarily embarrassed, the bank's affairs may take a fortunate turn. Some of the assets that cannot at once be converted into money may be of a character to justify the expectation that, if actual and open insolvency be avoided, they may be ultimately collectible, and thus the ruin of the bank and its creditors be prevented. *McDonald* v. *Chemical Nat. Bank*, 174 U. S. 610. But under the state statute, no such conservative action can be followed by the officers of the bank except at the risk of the penalties of fine and imprisonment. In such a case the provisions of the Federal statute would permit the Comptroller to withhold closing the bank and to give an opportunity to escape final insolvency. It would seem that such an exercise of discretion on the part of the Comptroller would, in many cases, be better for all concerned than the unyielding course of action prescribed by the state law. However, it is not our province to vindicate the policy of the Federal statute, but to declare that it cannot be overridden by the policy of the State.

Similar legislation to that of the State of Iowa has been considered and disapproved by the Supreme Courts of several of the other States.

Thus in *Commonwealth* v. *Ketner*, 92 Penn. St. 372, one Torrey was indicted and found guilty under a charge that, as the cashier of the First National Bank of Ashland, organized under

the laws of the United States, he had embezzled the moneys of the said bank contrary to the form of the act of assembly of the State of Pennsylvania, prescribing a penalty of fine and imprisonment. A writ of *habeas corpus* was allowed by the Supreme Court of the State, and the accused was discharged. That court, having quoted the acts of assembly relied on, said:

"We are spared further comment upon these acts for the reason that they have no application to national banks. Neither of them refers to national banks in terms, and we must presume, that when the legislature used the words 'any bank,' that it referred to banks created under and by virtue of the laws of Pennsylvania. The national banks are the creatures of another sovereignty. They were created and are now regulated by the acts of Congress. When our acts of 1860 and 1861 were passed, there were no national banks, nor even a law to authorize their creation. When the act of 1878 was passed, Congress had already defined and punished the offence of embezzlement by the officers of such banks. There was therefore no reason why the State, even if it had the power, should legislate upon the subject. Such legislation could only produce uncertainty and confusion, as well as a conflict of jurisdiction. In addition, there would be the possible danger of subjecting an offender to double punishment, an enormity which no court would permit, if it had the power to prevent it. An act of assembly prescribing the manner in which the business of *all* banks shall be conducted, or limiting the number of the directors thereof, could not by implication be extended to national banks, for the reason, that the affairs of such banks are exclusively under the control of Congress. Much less can we, by mere implication, extend penal statutes . . . to such institutions. The offence for which the relator is held, is not indictable, either at common law or under the statutes of Pennsylvania. We therefore order him to be discharged."

In *Allen's Appeal*, 119 Pa. St. 192, the question was whether a state law, which forbade " any cashier of any bank from engaging, directly or indirectly, in the purchase or sale of stock, or in any other profession, occupation or calling other than his duty as cashier," and which declared the same to be a misde-

meanor, was applicable to the cashier of a national bank, and it was held that it was not so applicable, the court saying, among other things:

"The national banking act and its supplements create a complete system for the government of those institutions. Conceding the power of Congress to create this system, we are unable to see how it can be regulated or interfered with by state legislation. The act of 1860, if applied to national banks, imposes a disqualification upon cashiers of such institutions where none has been imposed by act of Congress. If the State may impose one qualification upon the cashiers, why not another? If upon the cashier, why not upon the president or other officer? Nay, further, suppose the legislature should declare that no person should be a bank director unless he has arrived at fifty years of age, or should be the owner of one hundred shares of stock, could we apply such an act to national banks? If so, such institutions would have a precarious existence. They would be liable to be interfered with at every step, and it might not be long before the whole national banking system would have to be thrown aside as so much worthless lumber."

*People* v. *Fonda*, 62 Michigan, 401, was a case wherein a clerk of a national bank was prosecuted in a state court and found guilty of larceny and embezzlement of the funds of the bank under the statute of the State. But it was held by the Supreme Court of the State that the offence was within the laws of the United States, and that, accordingly, the state court was without jurisdiction. It was said by the court, in view of section 711 of chapter 12 of the Revised Statutes of the United States, in the following terms: "The jurisdiction vested in the courts of the United States in the cases and proceedings hereinafter mentioned, shall be exclusive of the courts of the several States: First, of all crimes and offences cognizable under the authority of the United States;" that, Congress, by law, created the national banking system, and provided for its internal workings, and prescribed a punishment for the offence charged against the defendant. It seems clearly the case is one falling within section 711 above quoted, and that by the Federal law

itself the jurisdiction of the State is expressly excluded. ·Chancellor Kent, in his commentaries, 1 Com. 400, says: "In judicial matters the concurrent jurisdiction of the state tribunals depends altogether upon the pleasure of Congress, and may be revoked and extinguished whenever they think proper, in every case in which the subject matter can constitutionally be made cognizable in the Federal courts; and, without an express provision to the contrary, the state courts will retain a concurrent jurisdiction in all cases where they had · jurisdiction originally over the subject matter;" and accordingly the judgment of the trial court was reversed and the prisoner discharged.

In *Commonwealth* v. *Felton*, 101 Massachusetts, 204, the defendant was charged with being an accessory to an embezzlement by an officer of a national bank, and it was said by the court:

"The difficulty in the way of holding the defendant upon the present indictment is, that the act of Congress has taken the crime of the principal out of our jurisdiction. Our courts cannot deal with him upon that charge."

A law of the State of Kansas provided that no bank should receive deposits when it was insolvent, and prescribed a punishment for a violation of that provision by any officer or agent of such bank; but it was held by the Supreme Court of that State that the provisions of the state law had no application to national banks, and that the penalties prescribed were not operative as against officers of national banks. *State* v. *Menke*, 56 Kansas, 77.

The same view has prevailed in the lower Federal courts. In *Sutton Manufacturing Company* v. *Hutchinson*, 63 Fed. Rep. 496, 501, it was said by the Circuit Court of Appeals, through Mr. Justice Harlan:

"A corporation is not required by any duty it owes to creditors to suspend operations the moment it becomes financially embarrassed, or because it may be doubtful whether the objects of its creation can be attained by further effort upon its part. It is in the line of right and of duty when attempting, in good faith, by the exercise of its lawful powers and by the use of all

legitimate means, to preserve its active existence, and thereby accomplish the objects for which it was created."

In *In re Waite*, 81 Fed. Rep. 359, it was held by the Circuit Court of the United States for the District of Iowa that a pension examiner of the United States was not liable to a criminal prosecution in the courts of a State for acts done by him in his official capacity. In the opinion it was said:

" The question which marks the limit of the state jurisdiction is whether the person sought to be called to account was acting under the authority of the United States when the acts complained of were done, in and about a subject matter within Federal jurisdiction . . . for the criminal statutes of the State are not applicable to acts done within the plane of Federal jurisdiction, and under the authority of the United States. Whenever it is made to appear in a criminal case pending in the state court that the acts charged in the indictment were done by defendant as an officer or agent of the United States in and about a matter within Federal control, . . . then it is made to appear that the state court is asked to assume a jurisdiction which it cannot rightfully exercise ; and if that court entertains the case, and proceeds to adjudicate on the question of the extent of the authority possessed by the officers of the United States, . . . . testing the same by the provisions of state statutes, . . . it proceeds at the peril of having its jurisdiction questioned and denied."

So, in *In re Thomas*, 82 Fed. Rep. 304, it was held by the Circuit Court of the United States for the Southern District of Ohio that, the governor of the soldiers' home at Dayton, Ohio, in serving to the inmates, as food, oleomargarine furnished by the government, is not subject to the law of the State prescribing the manner in which oleomargarine shall be used in eating houses, because his act is that of the government of the United States within its constitutional powers, and wholly beyond the control or regulation of the legislature of the State.

This judgment was affirmed by this court in *Ohio* v. *Thomas*, 173 U. S. 276.

A leading case in which this court had occasion to consider the limitation of legislation by a State affecting a subject within

the scope of action by Congress is that of *Prigg* v. *Pennsylvania,* 16 Pet. 539, from which we quote the following observations :

"If Congress have a constitutional power to regulate a particular subject, and they do actually regulate it in a given manner, and in a certain form, it cannot be that state legislatures have a right to interfere, and, as it were, by way of complement to the legislation of Congress, to prescribe additional regulations, and what they may deem auxiliary provisions for the same purpose. In such case, the legislation of Congress, in what it does prescribe, manifestly indicates that it does not intend that there shall be any farther legislation to act upon the subject matter. Its silence as to what it does not do, is as expressive of what its intention is as the direct provisions made by it."

On the immediate subject of control over national banks it was said, in *Farmers' National Bank* v. *Dearing,* 91 U. S. 29 :

"The States can exercise no control over national banks, nor in anywise affect their operation, except so far as Congress may see proper to permit. Everything beyond this is 'an abuse, because it is the usurpation of power which a single State cannot give.' Against the national will ' the States have no power, by taxation or otherwise, to retard, impede, burden, or in any manner control the operation of the constitutional laws enacted by Congress to carry into execution the powers vested in the general government.' "

This subject has received recent and careful consideration in the case of *Davis* v. *Elmira Savings Bank,* 161 U. S. 275, twice argued in this court. The legislature of the State of New York had provided by law that savings banks, organized under the laws of that State, should have a preference as depositors in banks in case of the insolvency of such banks, and it was sought to apply this provision to the case of a deposit by a savings bank in a national bank which had subsequently become insolvent. But this court held that such a provision could not be extended by a State to national banks, because it was repugnant to that provision of the national banking act which requires the assets of an insolvent national bank

to be ratably distributed among its creditors. In the opinion of the court, by Mr. Justice White, it was said:

"National banks are instrumentalities of the Federal government, created for a public purpose, and as such necessarily subject to the paramount authority of the United States. It follows that an attempt, by a State, to define their duties or control the conduct of their affairs is absolutely void, wherever such attempted exercise of authority conflicts with the laws of the United States, and either frustrates the purpose of the national legislation or impairs the efficiency of those agencies of the Federal government to discharge the duties, for the performance of which they were enacted. These principles are axiomatic, and are sanctioned by the repeated adjudications of this court."

Our conclusions, upon principle and authority, are that Congress, having power to create a system of national banks, is the judge as to the extent of the powers which should be conferred upon such banks, and has the sole power to regulate and control the exercise of their operations; that Congress has directly dealt with the subject of insolvency of such banks by giving control to the Secretary of the Treasury and the Comptroller of the Currency, who are authorized to suspend the operations of the banks and appoint receivers thereof when they become insolvent, or when they fail to make good any impairment of capital; that full and adequate provisions have been made for the protection of creditors of such institutions by requiring frequent reports to be made of their condition, and by the power of visitation by Federal officers; that it is not competent for state legislatures to interfere, whether with hostile or friendly intentions, with national banks or their officers in the exercise of the powers bestowed upon them by the general government.

*Cross* v. *North Carolina*, 132 U. S. 131, was a case wherein this court pointed out the distinction between crimes defined and punishable at common law or by the general statutes of a State and crimes and offences cognizable under the authority of the United States; and accordingly it was held that the crime of forging promissory notes, purporting to be made by indi-

viduals, and made payable to or at a national bank, was a distinct and separate offence, indictable under the laws of the State.

Undoubtedly a State has the legitimate power to define and punish crimes by general laws applicable to all persons within its jurisdiction. So, likewise, it may declare, by special laws, certain acts to be criminal offences when committed by officers or agents of its own banks and institutions. But it is without lawful power to make such special laws applicable to banks organized and operating under the laws of the United States.

It was by failing to observe the distinction between the two classes of cases that, we think, the courts below fell into error.

*The judgment of the Supreme Court of Iowa is reversed, and the cause is remanded to that court to take further action not inconsistent with the opinion of this court.*